ORAL ARGUMENT IN THIS CASE
HAS NOT YET BEEN SCHEDULED.

# In the
# UNITED STATES COURT OF APPEALS
## for the District of Columbia Circuit

————————————

Case No. 11-1330

————————————

PMCM TV, LLC,

*Appellant*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee*

————————————

On Appeal from an Order of
the Federal Communications Commission

————————————

## FINAL BRIEF OF APPELLANT
## PMCM TV, LLC

————————————

DONALD J. EVANS
HARRY F. COLE
ANNE GOODWIN CRUMP
CHRISTINE E. GOEPP

Fletcher, Heald & Hildreth, P.L.C.
1300 N. 17th Street - 11th Floor
Arlington, Virginia  22209
(703) 812-0400

*Counsel for Appellant PMCM TV, LLC*

Final Brief filed:   January 3, 2012

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Appellant, PMCM TV, LLC ("PMCM"), by its attorneys, certifies as follows:

### A.     Parties and Amici.

The following parties appeared in the proceedings before the Federal Communications Commission ("FCC" or "Commission"):

> PMCM
> Nave Broadcasting, LLC.

The following parties are before this Court:

> PMCM
> Federal Communications Commission

### B.     Ruling Under Review

The ruling under review is *Reallocation of Channel 2 from Jackson, Wyoming to Wilmington, Delaware and Reallocation of Channel 3 from Ely, Nevada to Middletown Township, New Jersey*, Memorandum Opinion and Order, 26 FCC Rcd 13696 (2011) (JA at 196).

### C.     Related Cases

There are no related cases presently before this Court.  PMCM previously filed a Petition for Issuance of Writ of Mandamus in this Court on January 5, 2010 seeking an extraordinary writ to compel the FCC to perform the ministerial act required by Section 331(a) of the Communications Act of 1934, as amended,

47 U.S.C. §331(a). *PMCM TV, LLC*, Case No. 10-1001 (D.C. Cir. Jan. 5, 2010).

The Court denied that Petition, as well as a subsequent Petition for Rehearing *En Banc*, on May 12, 2010 and August 6, 2010, respectively.

**DISCLOSURE STATEMENT PURSUANT TO RULE 26.1**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Rules of this Court, PMCM, appellant in this case, provides the following information:

PMCM is a closely held limited liability company without any subsidiaries, parent companies, or affiliates which have issued shares or debt securities.  PMCM is the licensee of the VHF television stations the modification of whose licenses is at issue in the FCC proceeding on review in this case.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings and Related Cases ................................ ii

Disclosure Statement Pursuant to Rule 26.1 .......................................... iv

Table of Contents ................................................................................. v

Table of Authorities ........................................................................... vii

Glossary .............................................................................................. x

Jurisdictional Statement ..................................................................... xii

Issue Presented for Review .................................................................. 1

Pertinent Statute ................................................................................. 1

Statement of the Facts ......................................................................... 2

       Section 331(a) .............................................................................. 2

       The DTV Transition and the FCC's Failure to Comply with
          Section 331(a) ........................................................................ 5

       The Proceedings Below ............................................................... 8

Standard of Review ............................................................................ 11

Summary of Argument ....................................................................... 12

Statement Regarding Standing ........................................................... 14

Argument ......................................................................................... 14

    I.     Under *Chevron – Step One*, Reallocation of PMCM's
         Channels Is Mandated by Section 331(a) ................................. 14

        A.    Congress's Intent Underlying Section 331(a) Is Clear and
             Its Direction Unmistakable. ............................................... 15

        B.    The PMCM Notifications Satisfied All Elements of
             Section 331(a) ................................................................ 18

    II.    The FCC's Strained Effort to Remove this Case from
         *Chevron – Step One* by Attempting to Impart Ambiguity
         to the Unambiguous Language of Section 331(a) Is
         Unavailing. ........................................................................ 18

        A.    The FCC's Interpretation of Section 331(a) Is
             Inconsistent with the Plain Language of the Statute ............ 19

B.    The FCC's Interpretation is Inconsistent with the
Legislative History of Section 331(a). ....................................22

C.    The FCC's Interpretation is Inconsistent with the Purpose
and Structure of the Statute. ....................................................24

    1.    *The purpose of the statute.* ..............................................24

    2.    *The structure of the statute* ............................................28

III.    Even If the FCC's Decision Survives, *Arguendo*,
*Chevron – Step One*, It Fails Under *Chevron – Step Two*
Because It Is Not in Any Event Rationally Related to the
Goals of Section 331(a) and Is Arbitrary and Capricious. .................31

A.    The DTV Transition Did Not Prevent the FCC From
Allocating Commercial VHF Channels to Any State. ..............32

B.    The Commission's Decision Below Is Based on Incorrect
Descriptions of Commission Precedent. ...................................35

    1.    *The MO&O misstates Commission policy
with respect to historical "impediments" to
reallocation.* .......................................................................35

    2.    *The Commission Misstates Its Own
Historical Use of the Term "Reallocation".* ..................39

C.    The FCC's Interpretation of Section 331(a) Would
Afford Neither the Protections nor the Service Claimed
by the Commission. ..................................................................42

IV.    Conclusion and Request for Relief. ....................................................45

Certificate of Compliance ........................................................................49

Certificate of Service ...............................................................................50

## TABLE OF AUTHORITIES

### *Judicial Decisions*

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) .............................. 12, 45

*AT&T v. FCC*, 452 F.3d 830 (2006).................................................................14

*Boyden v. Commissioner of Patents*, 441 F.2d 1041(D.C. Cir. 1971) ........................................................................................................16

*\*/* *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ......................... 11, 12, 13, 14, 15, 18, 30, 31, 45

*Citizens Coal Council v. Norton,* 330 F.3d 478 (D.C. Cir. 2003) ........................................................................................................14

*Consolidated Rail Corporation v. U.S.*, 896 F.2d 574 (D.C. Cir. 1989)............................................................................................... 19, 30

*Consumer Electronics Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) ........................................................................................................14

*Gordon v. Virumundo, Inc.,* 575 F. 3d 1040 (9th Cir. 2009).................... 14, 24

*Jones v. Lujan*, 883 F.2d 1031 (D.C. Cir. 1989) ...................................... 20, 21

*Lewis v. City of Chicago*, 130 S.Ct. 2191 (2010) ...........................................21

*\*/* *Multi-State Communications, Inc. v. FCC*, 728 F.2d 1519 (D.C. Cir. 1984)........................................ xii, 3, 4, 5, 16, 17, 22, 23, 24, 25

*Natural Resources Defense Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011)............................................................................................20

*Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145 (D.C. Cir. 2005) ............................................................................................... 12, 31

*Oceana, Inc. v. Locke*, Case No. 10-5299 (D.C. Cir. July 19, 2011) ........................................................................................................20

*SBC Communications Inc. v. FCC*, 138 F.3d 410 (D.C. Cir. 1998) ........................................................................................................15

*U.S. v. Ron Pair Enterprises, Inc.*, 498 U.S. 235 (1989) ...............................19

*\*/* *Village of Barrington, IL v. Surface Transportation Board*, 636 F.3d 659 (D.C. Cir. 2011)...................................................... 12, 17, 31

*Administrative Decisions*

*Advanced Television Systems and Their Impact on Existing Television Broadcast Service,* 23 FCC Rcd 4220 (2008)..........................40

*Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, 12 FCC Rcd 14588 (1997)................................................................................................6

*Amendment of Section 73.606(b) (Montrose and Scranton, Pennsylvania)*, 3 FCC Rcd 1061 (Media Bureau 1988)...........................40

*Amendment of Section 73.606(b) (Snyder, Texas)*, 6 FCC Rcd 5791 (Media Bureau 1991).....................................................................40

*/ *Amendment of Section 73.606(b), Table of Assignments, Television Broadcast Stations (Riverside and Santa Ana, California)*, Report and Order, 65 FCC 2d 920 (1977)..................... 36, 37

*Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Atlantic City, New Jersey)*, Notice of Proposed Rulemaking, 24 FCC Rcd 14601 (Vid. Div. 2009) ................................................................ 10, 25

*Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Seaford,  Delaware),* Notice of Proposed Rulemaking, 24 FCC Rcd 14596 (Vid. Div. 2009)............................. 9, 24

*Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Seaford, Delaware),* Report and Order, 24 FCC Rcd 4466 (Vid. Div. 2010), *petition for reconsideration pending* .........................................................................33

*Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations (Atlantic City, New Jersey)*, Report and Order, 25 FCC Rcd 2606 (2010)................................................................................. 7, 33

*/ *Modification of FM and TV Authorizations to Specify a New Community of License*, Report and Order, 4 FCC Rcd 4870 (1989)............................................................ 37, 38, 40, 41

*/    *Authorities upon which we chiefly rely are marked with asterisks.*

*Oversight of the Radio and TV Broadcast Rules*, 1 FCC Rcd
849 (Mass Media Bureau 1986) ................................................................40

*Petition for Inquiry into the Need for Adequate Television
Service for the State of New Jersey,* 58 FCC2d 790 (1976) ......................41

*Petition to Reallocate VHF Television Channel 9,* 53 RR2d
469 (1983), *aff'd sub nom. Multi-State Communications,
Inc. v. FCC*, 728 F.2d 1519 (D.C. Cir. 1984) ........................................4, 5

*/ *RKO General, Inc.*, 1 FCC Rcd 1081 (1986). ...................................... 8, 17, 29

*SRC, Inc., San Angelo, TX*, 21 FCC 2d 901 (1970) ..........................................39

*Third Periodic Review of the Commission's Rules and Policies
Affecting the Conversion To Digital Television*, 22 FCC
Rcd 9478 (2007) ................................................................................ 6, 33

## Statutes

47 U.S.C. §153(v) .........................................................................................10

47 U.S.C. §307(b) ....................................................................................... 5, 27

*/ 47 U.S.C. §331(a) ...........................xii, 2, 3, 4, 8, 15, 16, 20, 21, 28, 29, 45, 46

47 U.S.C. §402(b) ......................................................................................... xii

## Regulations

47 C.F.R. §1.420(i) .......................................................................................40

47 C.F.R. §73.610(b) ...................................................................................43

47 C.F.R. §73.622 ........................................................................................35

47 C.F.R. §73.622(i) ......................................................................................5

47 C.F.R. §73.623(d) ...................................................................................43

## Other Authorities

*/ H.R. Rep. No. 760, 781 (1982), *reprinted in* 1982
U.S.C.C.A.N., 1453 ................................................................. 22, 24, 36

# GLOSSARY

| | |
|---|---|
| Bureau | The Media Bureau of the FCC |
| *Chevron* | *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) |
| Commission or FCC | Federal Communications Commission |
| *Conference Report* | H.R. Rep. No. 760, 781 (1982), *reprinted in* 1982 U.S.C.C.A.N., 1453, the Conference Report accompanying Section 331(a) |
| DTV | Digital Television, the television transmission system that is based on digital, rather than analog, signals.  As directed by Congress, the FCC ordered the conversion of all full-power television stations to DTV operation as of June 13, 2009. |
| DTV Table | The Digital Television Table of Allotments (also referred to by the Commission variously as the Table of Assignments or the Table of Allocations), 47 C.F.R. §73.622 |
| *Letter Order* | *Letter from William T. Lake to PMCM TV, LLC c/o Harry F. Cole,* 24 FCC Rcd 14588 (MB 2009) (JA 120), the 2009 decision by the Chief, Media Bureau, initially rejecting the PMCM Notifications |
| *MO&O* | *Reallocation of Channel 2 from Jackson, Wyoming to Wilmington, Delaware and Reallocation of Channel 3 from Ely, Nevada to Middletown Township, New Jersey*, Memorandum Opinion and Order, 26 FCC Rcd 13696 (2011) (JA 196), the 2011 decision of the FCC affirming the *Letter Order* of the Media Bureau rejecting the PMCM Notifications.  This order is the subject of the instant appeal. |

| | |
|---|---|
| *Multi-State* | *Multi-State Communications, Inc. v. FCC*, 728 F. 2d 1519 (D.C. Cir. 1984) |
| PMCM | PMCM TV, LLC, the appellant herein |
| PMCM Notifications | Notifications submitted to the FCC by PMCM on June 15, 2009, pursuant to Section 331(a) of the Communications Act of 1934, as amended, 47 U.S.C. §331(a) (JA 9, 17) |
| *Riverside* | *Amendment of Section 73.606(b), Table of Assignments, Television Broadcast Stations (Riverside and Santa Ana, California)*, Report and Order, 65 FCC 2d 920 (1977) |
| RKO | RKO General, Inc., the former licensee of Station WOR-TV, the only station previously to have invoked Section 331(a) |
| Section 331(a) | Section 331(a) of the Communications Act of 1934, as amended, 47 U.S.C. §331(a) |
| UHF | Ultra High Frequency.  This refers to television Channels 14 – 51 |
| VHF | Very High Frequency.  This refers to television Channels 2-13 |
| *1989 Change-of-Community Policy* | *Modification of FM and TV Authorizations to Specify a New Community of License*, Report and Order, 4 FCC Rcd 4870 (1989) |

## JURISDICTIONAL STATEMENT

This is an appeal of a final Commission order, *Reallocation of Channel 2 from Jackson, Wyoming to Wilmington, Delaware and Reallocation of Channel 3 from Ely, Nevada to Middletown Township, New Jersey,* Memorandum Opinion and Order, 26 FCC Rcd 13696 (rel. September 15, 2011) ("*MO&O*"). The *MO&O* rejected notifications (the "PMCM Notifications") by PMCM seeking the reallocation, to New Jersey and Delaware, of the licenses of two VHF television stations of which PMCM is the licensee. The FCC is directed by 47 U.S.C. §331(a) of the Communications Act of 1934, as amended, to implement such notifications. The Commission therefore had subject matter jurisdiction over this matter.

This Court has jurisdiction pursuant to 47 U.S.C. §402(b) because the FCC's action constitutes a denial of a license modification. This Court has previously exercised its jurisdiction to review actions taken by the Commission pursuant to Section 331(a). *Multi-State Communications, Inc. v. FCC*, 728 F.2d 1519 (D.C. Cir. 1984).

PMCM's Notice of Appeal was timely filed with this Court on September 21, 2011. The FCC's *MO&O* is a final agency order that disposes of all parties' claims.

## ISSUE PRESENTED FOR REVIEW

Congress enacted an extraordinary statute, 47 U.S.C. §331(a), enabling commercial VHF television licensees to unilaterally relocate their licenses to states lacking a commercial VHF channel allocation. PMCM invoked this statutory mechanism to relocate its TV stations to New Jersey and Delaware, two states which, at the time of the PMCM Notifications, lacked any commercial VHF allocations. By refusing to implement the PMCM Notifications, did not the FCC (a) contravene the plain prescription and command of the statute and (b) defeat the intent of the statute?

## PERTINENT STATUTE

### 47 U.S.C. §331(a)

(a)     Very high frequency stations

It shall be the policy of the Federal Communications Commission to allocate channels for very high frequency commercial television broadcasting in a manner which ensures that not less than one such channel shall be allocated to each State, if technically feasible. In any case in which [sic] licensee of a very high frequency commercial television broadcast station notifies the Commission to the effect that such licensee will agree to the reallocation of its channel to a community within a State in which there is allocated no very high frequency commercial television broadcast channel at the time [sic] such notification, the Commission shall, notwithstanding any other provision of law, order such reallocation and issue a license to such licensee for that purpose pursuant to such notification for a term of not to exceed 5 years as provided in section 307(d) of this title.

## STATEMENT OF THE FACTS

This case involves an effort by PMCM to relocate its two VHF television stations, KVNV(TV) and KJWY(TV), from Ely, Nevada and Jackson, Wyoming, respectively, to New Jersey and Delaware, also respectively, pursuant to Section 331(a).  That section specifically requires the FCC to effectuate such relocations in the circumstances presented here, "notwithstanding any other provision of law".  Despite that clear and unequivocal statutory direction, the Commission refused to comply with its statutory duty.

### Section 331(a)

Section 331(a), the text of which is set out on the preceding page, reflects Congress's determination that, as a matter of national policy, it is of overriding importance that each state have at least one commercial VHF television channel allocated to it.  The first sentence of the section announces that policy, directing the Commission to assure such distribution of VHF channels.

Achievement of that policy was of such importance that Congress provided a backstop in the event that the Commission, for whatever reason, failed to implement the statutory directive.  The second sentence of Section 331(a) provides that if, despite Congress's instruction in the first sentence, a state lacks a commercial VHF channel, the licensee of a VHF station may notify the FCC of that licensee's willingness to the reallocation of its channel to that State.  In that

event the FCC "shall, notwithstanding any other provision of law, order such reallocation". If the Commission failed to do the job imposed by the first sentence, through the second sentence Congress expressly invited – indeed, encouraged – private parties to fill the void left by the FCC's failure.

All that's required to take advantage of that invitation is a simple notification to the FCC by a commercial VHF licensee in which the licensee advises the Commission of the licensee's willingness to the reallocation of its station to a state which, at the time of the notification, has no commercial VHF channel then allocated to it.

Section 331(a) was enacted in 1982. At that time New Jersey and Delaware lacked their own commercial VHF channels[1], primarily because the FCC had allocated all available VHF channels in the region to larger cities, including particularly New York City, Philadelphia, Washington and Baltimore, thereby precluding the allocation of such channels to those two states. Section 331(a) was Congress's response to that situation. Although the statute's legislative history makes clear that its initial impetus was the lack of commercial VHF channels in New Jersey and Delaware, the scope of the law was not and is not limited by its

---

[1] While New Jersey technically had a commercial allocation in Channel 13, both the Commission and this Court determined that, for purposes of Section 331(a), that channel should be deemed to be noncommercial since it had historically been operated noncommercially by WNET. *Multi-State Communications, Inc. v. FCC*, 728 F.2d 1519 (D.C. Cir. 1984).

terms to just those states.  It applies whenever *any* state is, or becomes, commercial VHF-less.

Prior to the instant case, Section 331(a) had been invoked only once.  In 1982, very shortly after the law was enacted, RKO General, Inc. ("RKO"), the licensee of WOR-TV, filed a notification seeking to have that station, then allocated to New York City, reallocated to Secaucus, New Jersey.  *See Petition to Reallocate VHF Television Channel 9,* 53 RR2d 469 (1983), *aff'd sub nom. Multi-State Communications, Inc. v. FCC ("Multi-State")*, 728 F.2d 1519 (D.C. Cir. 1984).  At that time RKO was embroiled in a long-running comparative renewal battle and at serious risk of losing its license.  Not only had RKO been challenged by a competing applicant, but RKO had been preliminarily determined *not* to be qualified to own any broadcast stations.  *Id.* at 1521.  By availing itself of Section 331(a), RKO was able to sidestep those fatal threats to its license, since Section 331(a) provides for issuance of a license "notwithstanding any other provision of law".  *Id.* at 15240-25.

The Commission promptly reallocated RKO's channel and granted RKO its license.  As a result, the comparative renewal proceeding which had threatened RKO's license for approximately a decade was abruptly terminated without regard to: the interests of RKO's challenger there; or the comparative renewal processes pursuant to which that challenge had been undertaken; or the questions concerning

–4–

RKO's basic qualifications to remain a licensee; or whether Secaucus (RKO's proposed New Jersey community of license) was a preferable community of license under then-operative statutory or regulatory allocation policies derived from, *e.g.*, 47 U.S.C. §307(b).  *Id.*  Both the Commission and this Court correctly concluded that the broad mandate of Section 331(a) left the Commission with no discretion to do anything but issue the revised license to RKO.  *Id.*

### The DTV Transition and the FCC's Failure to Comply with Section 331(a)

 For the next 27 years, Section 331(a) was ignored by the FCC.  This is remarkable, because during that time the Commission engaged in a comprehensive overhaul of television channel allotments in connection with the transition from analog to digital television ("DTV") technology.  That overhaul resulted in a DTV Table of Allotments ("DTV Table"), 47 C.F.R. §73.622(i), which replaced the former table of analog TV channel allotments.  This entailed a wholesale re-shuffling of television channel allocations, as the allocations of all channels in all U.S. states and territories were evaluated and adjusted as necessary to "re-pack" the digital stations into a smaller amount of spectrum.  Channel assignments for numerous stations were changed either at the stations' request or at the direction of the Commission in order to accommodate the new allotment scheme.

Developed gradually through a painstaking process that took more than a decade, the DTV Table constituted the Commission's reallocation of television channels on a state-by-state basis. The DTV Table was initially proposed by the Commission in 1997, *see Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, Sixth Report and Order, 12 FCC Rcd 14588 (1997), and was adopted in its final form (subject to some minor revisions not relevant here) in 2007, *see Third Periodic Review of the Commission's Rules and Policies Affecting the Conversion To Digital Television*, Report and Order, 22 FCC Rcd 9478 (2007). The FCC thus had more than a decade in which to make sure that every state had at least one commercial VHF channel allocated to it.

Surprisingly – in view of Section 331(a)'s clear, unequivocal and continuing mandate – when the final DTV Table was unveiled in 2007, it included no commercial VHF channels for either New Jersey or Delaware. This was particularly odd because the Commission's DTV allocation plan effectively cleared the mid-Atlantic seaboard of VHF Channels 2, 3, 4 and 5. That meant that any of those channels could have been allocated to Delaware and New Jersey as post-DTV transition channels in fulfillment of Congress's direction in Section 331(a). At no point in this comprehensive overhaul did the Commission even allude to, much less comply with, its obligation to implement the policy mandated by Congress in Section 331(a).

–6–

Not only did the Commission fail to assure the availability of any new commercial VHF channels to Delaware or New Jersey, it *deleted* the only commercial VHF allotment that New Jersey had.  WWOR-TV – the station which had been the subject of the *Multi-State* proceeding in the 1980s – had been operating on VHF Channel 9 in New Jersey since its reallocation in 1983.  In connection with the DTV transition, WWOR-TV's licensee initially elected to retain Channel 9 for the station's digital operations – *but Commission records reflect that the FCC disapproved that election.*[2]  As a result, WWOR-TV was allotted UHF Channel 38 as its permanent digital channel.  *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations (Atlantic City, New Jersey)*, Report and Order, 25 FCC Rcd 2606, 2607 (2010).  This left both Delaware and New Jersey without commercial VHF allocations as of June 13, 2009, the date the new DTV Table of Allotments became effective and the former table of analog channel allotments became a nullity.

As noted above, Section 331(a) prescribes a quick and simple method for filling that void.  PMCM availed itself of that method.

---

[2] There does not appear to be any reported decision reflecting the Commission's disapproval of WWOR-TV's initial election.  That election was submitted to the Commission in File No. BFRECT-20050210AWA, a copy of which is included in the Joint Appendix at JA 210.  The disapproval is shown in the FCC's Consolidated Database System, a highlighted copy of which is included at JA 214.

**The Proceedings Below**

PMCM's owners have been broadcasters, in New Jersey and elsewhere, for more than half a century.  They recognized from the Commission's 2007 DTV Table that, notwithstanding Section 331(a), both New Jersey and Delaware would still be without commercial VHF channels following the DTV transition.  They sought to remedy that situation.

On June 15, 2009 – the first business day after the DTV transition became final – PMCM filed its Notifications with the FCC.  In those Notifications, which conformed to the statutory specifications, PMCM advised the Commission that PMCM agreed to have its VHF channels in Ely, Nevada and Jackson, Wyoming reallocated to Middletown Township, New Jersey and Wilmington, Delaware, respectively.  (JA 9, 17).  Because Congress had already made the public interest determination that such a reallocation supersedes all other considerations, the Commission had nothing to mull over.  It was obligated simply to perform the ministerial acts of changing the table of allotments and issuing the licenses. 47 U.S.C. §331(a); *see also RKO General, Inc.*, 1 FCC Rcd 1081, 1083 (1986).

In the 1983 *RKO* proceeding, the reallocation took only three months, and was effectuated by the Commission, consistent with Section 331(a)'s mandate. By contrast, PMCM's notifications languished, without explanation, for five months, only to be rejected *not* by the full Commission, but by the Media Bureau

("Bureau") – the agency office primarily responsible for the inexplicable omission of New Jersey and Delaware commercial VHF channels from the DTV Table of Allotments. *Letter from William T. Lake to PMCM TV, LLC c/o Harry*, 24 FCC Rcd 14588 (MB 2009) ("*Letter Order*").  (JA 120)

The Bureau's *Letter Order* rested on a strained interpretation of the word "reallocation" in Section 331(a), an interpretation supposedly arising from concern about some hypothetical situation that might involve interference.  The Bureau's concerns about potential interference were odd because the PMCM Notifications gave rise to *no* interference concerns at all, and the *Letter Order* did not even suggest that they might.

The *Letter Order* also dwelt on the Bureau's perception that Section 331(a) is a dated piece of legislation that had outlived its usefulness.  The Bureau's purported misgivings about the continued vitality of Section 331(a) were demonstrably less than sincere, however.  Simultaneously with the *Letter Order*, the Bureau initiated proceedings to allocate new commercial VHF channels to New Jersey and Delaware. *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Seaford, Delaware),* Notice of Proposed Rulemaking, 24 FCC Rcd 14596 (Vid. Div. 2009); *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Atlantic City, New Jersey)*, Notice of Proposed

–9–

Rulemaking, 24 FCC Rcd 14601 (Vid. Div. 2009). [3] Through those actions the Bureau conceded that Section 331(a) continues to impose on the Commission an obligation, notwithstanding the suggestion in the *Letter Order* that the statute might somehow be outmoded.

By proposing new channel allotments to New Jersey and Delaware, the Bureau effectively conceded the undeniable fact that both New Jersey and Delaware had been deprived of VHF channel allocations in the DTV Table. While the Commission suggests that it was unable to provide such channels prior to the DTV transition, that is demonstrably false. *See infra* at 28-31. And while the Commission may attempt to claim that it acted promptly following the DTV transition to satisfy the mandate of Section 331(a), that, too, is demonstrably false, as the Commission has, to this day, still failed to allocate a commercial VHF channel to the Virgin Islands. [4] *See infra* at 34-35, 44.

The Bureau's *sua sponte* effort, commenced in December, 2009, to finally allocate VHF channels to New Jersey and Delaware and thus comply with the first

_____

[3] After allotting commercial VHF channels to Seaford, Delaware, and Atlantic City, New Jersey, through these proceedings, the Commission conducted an auction of the channels and has since issued construction permits for both channels. As noted in the text, above, these allocations are immaterial to PMCM's position here.

[4] "State" for purposes of the Communications Act includes Territories and possessions. *See* 47 U.S.C. §153(v).

sentence of Section 331(a) is immaterial to PMCM's rights under Section 331(a).

That section provides that PMCM is entitled to reallocation because, *at the time of its notifications – i.e.*, six months *before* the Bureau even started the process of allocating channels there – there was no commercial VHF channel allotted to either New Jersey or Delaware.

PMCM sought review of the *Letter Order.* [5]  In so doing, it was joined by members of Congress who supported PMCM's efforts.  That support further underscores the continuing vitality of Section 331(a).

On September 15, 2011 – 27 months after PMCM filed its notifications – the full Commission issued its *MO&O* affirming the Bureau's decision. (JA 196) PMCM immediately filed its notice of appeal with this Court.

**STANDARD OF REVIEW**

This is a *Chevron – Step One* case.  *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ("*Chevron*").  When Congress has directly spoken to the precise question at issue and its intent is clear – as Congress did in this case – "that is the end of the matter": the court must give effect to Congress's intent.  *Id.* at 842-3. If the agency has violated Congress's precise

_____

[5] PMCM also filed a mandamus petition with this Court, seeking immediate judicial intervention.  *PMCM TV, LLC*, No. 10-1001 (D.C. Cir. Jan. 5, 2010).  The Court denied PMCM's request for extraordinary relief.

–11–

instructions – as the FCC did below – then the agency's interpretation is unlawful. *Id*. at 842.

Even if the statute were determined, *arguendo*, not to be so clear as to trigger *Chevron – Step One*, no deference would be due the agency's interpretation under *Chevron – Step Two*. To be entitled to deference under that principle, an agency's interpretation must be "rationally related to the goals of the statute", *Village of Barrington, IL v. Surface Transportation Board*, 636 F.3d 659, 660 (D.C. Cir. 2011) (citing *AT&T Corp. v. Iowa Utils. Bd*., 525 U.S. 366, 388 (1999)), and not otherwise arbitrary and capricious, *Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145 (D.C. Cir. 2005). The FCC's interpretation of Section 331(a) was *not* rationally related to Congress's goal. To the contrary, its interpretation, which was based on multiple demonstrable inaccuracies, unquestionably *defeated* the statutory purpose in several respects and was otherwise arbitrary and capricious.

## SUMMARY OF ARGUMENT

When Congress has directly spoken to the precise question at issue and has prescribed, with clear and unmistakable intent, a particular course of agency action, an agency's failure to follow the prescribed course is unlawful and must be reversed. In Section 331(a), Congress has, with extraordinary clarity, directed the FCC to take certain actions under certain circumstances present here,

*notwithstanding any other provision of law*.  The FCC failed to take those actions.  That failure must be reversed pursuant to *Chevron – Step One*.

The Commission below sought to justify its action through a fanciful interpretation of a single word ("reallocation") in Section 331(a).  That interpretation, however, is inconsistent with the plain language, purpose, structure and legislative history of the statute.  Since the Commission has failed to provide *any* indication, much less a clear and credible indication, supporting its imagined interpretation, *Chevron* mandates that the plain meaning of the statutory language must be deemed "conclusive".

Even if *Chevron – Step One* were deemed, *arguendo*, inapplicable here, the FCC's action below could not survive even the more relaxed *Chevron – Step Two*.  The Commission's refusal to reallocate PMCM's commercial VHF television stations as required by Section 331(a) was based on assertions of FCC procedures and precedents that were demonstrably and dramatically inaccurate.  Further, the statutory interpretation on which the Commission relies would lead to results clearly inconsistent even with the Commission's own claims as well as Congress's intent.  It is therefore arbitrary, capricious and not rationally related to the goals of the statute.

## STATEMENT REGARDING STANDING

Appellant PMCM has suffered and continues to suffer harm from the FCC's refusal to reallocate PMCM's licenses under the mechanism established by Section 331(a) of the Act. The Court can remedy that harm by directing the FCC to comply with the statute and effect the reallocations.

## ARGUMENT

## I. Under *Chevron – Step One*, Reallocation of PMCM's Channels Is Mandated by Section 331(a).

When Congress has directly spoken to the precise question at issue and its intent is clear, "that is the end of the matter": the court must give effect to Congress's intent. *Chevron*, 467 U.S. at 842-3. In answering the question whether Congress has "directly spoken" to an issue, a court "employs traditional tools of statutory construction." *AT&T v. FCC*, 452 F.3d 830, 835 (2006) (quoting *Chevron*, 467 U.S. at 843 n.9)). This analysis begins, "as always, with the plain language of the statute." *Id.* (quoting *Citizens Coal Council v. Norton,* 330 F.3d 478, 482 (D.C. Cir. 2003). Furthermore, the statute must be read to effectuate its intended purpose. *Gordon v. Virumundo, Inc.,* 575 F. 3d 1040, 1049 (9th Cir. 2009). Legislative history can also be used to shed light on Congressional intent. *Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003).

–14–

During a *Chevron – Step One* analysis, the court determines on its own

whether the statute is ambiguous, without regard to the FCC's reasoning. *SBC*

*Communications Inc. v. FCC*, 138 F.3d 410, 418-19 (D.C. Cir. 1998). This case

falls comfortably within the scope of *Chevron – Step One*: the plain meaning of the

statutory language is reinforced in every aspect by both the statutory purpose and

legislative history.

### A.    Congress's Intent Underlying Section 331(a) Is Clear and Its Direction Unmistakable.

Section 331(a) is unambiguously clear and direct.  It charges the FCC with

the duty of implementing the goal of allocating at least one commercial VHF

television channel to each state.  Importantly, the statute prescribes a precise

alternative mechanism to achieve that goal in the event that the FCC fails for

whatever reason to carry out its statutory charge: the second sentence of

Section 331(a) requires the FCC to take certain very specific actions under certain

circumstances.  The statute eschews legalisms, provisos, qualifications, nuances

and niceties:

> In any case in which [sic] licensee of a very high frequency commercial
> television broadcast station notifies the Commission to the effect that such
> licensee will agree to the reallocation of its channel to a community within a
> State in which there is allocated no very high frequency commercial
> television broadcast channel at the time [sic] such notification, the
> Commission shall, notwithstanding  any other provision of law, order such
> reallocation and issue a license to such licensee for that purpose pursuant to

such notification for a term of not to exceed 5 years as provided in section 307(d) of this title.

The mandate is not only plain, it confers no discretion upon the agency. With stark directness, the statute compels – note the use of "shall", the language of nondiscretionary command, *see, e.g.*, *Boyden v. Commissioner of Patents*, 441 F.2d 1041, 1043, n.3 (D.C. Cir. 1971) – the Commission to take the prescribed actions.  Elsewhere in the Communications Act, the FCC is given broad discretion to act in the public interest as it perceives that interest – but not here. Section 331(a) instructs the agency: Just do it.

To emphasize the utmost priority assigned to this mandate, Congress required that its command be carried out "notwithstanding any other provision of law."  With that sweeping phrase, Congress superseded all other provisions of the United States Code and all other regulations in the Code of Federal Regulations in order to ensure that its directive would be given effect, as this Court has expressly recognized:

> Through its use of the phrase "notwithstanding any other provision of law" [in Section 331(a)], Congress expressly made inapplicable all provisions of law that would prevent or impede the voluntary movement of a VHF commercial station to an unserved state.

*Multi-State*, 728 F.2d at 1525.

Importantly, in interpreting Section 331(a) in *Multi-State*, the Court paid no heed to any views the Commission might have had about the statute's meaning;

–16–

rather, the Court reviewed the statute *de novo* and had no apparent difficulty in

concluding that

> The *plain language* of section 331 commands that if any licensee volunteers
> to move to an unserved state, "the Commission *shall*, notwithstanding any
> other provision of law, *order such reallocation and issue a license . . .*"

*Multi-State*, 728 F. 2d at 1524 (first emphasis added).

The Commission itself has acknowledged that the language of

Section 331(a) "gives us no discretion". *RKO General, Inc.*, 1 FCC Rcd 1081,

1083 (1986).

The nondiscretionary character of the required FCC action is underscored by

the unusual "notification" procedure prescribed by the statute.  That procedure

prescribes an essentially self-implementing process in which a commercial VHF

licensee simply notifies the FCC of its willingness to relocate, following which the

FCC immediately changes the table of allotments and issues the license.  The

FCC's is a ministerial, rubber-stamp role in this process.  As this Court has held,

when a statute prescribes a precise course of conduct for an agency, and the agency

then violates Congress's precise instructions, "then, as *Chevron* puts it, 'that is the

end of the matter' – the agency's interpretation is unlawful."  *Village of*

*Barrington, supra,* 636 F.3d at 660 *(citing Chevron*, 467 U.S. at 842).

–17–

**B.    *The PMCM Notifications Satisfied All Elements of Section 331(a)***

It is beyond dispute that the PMCM Notifications comported with

Section 331(a).  PMCM is the licensee of two commercial VHF television stations.

At the time of the PMCM Notifications, there were no commercial VHF channels

allotted to either New Jersey or Delaware.  In its Notifications PMCM advised the

FCC that PMCM agreed to the reallocation of its channels to communities in New

Jersey and Delaware.  With that, all elements of Section 331(a) were satisfied, and

the Commission was required to effectuate the reallocations as directed by

Congress.  The Commission's failure to do so was unlawful, and it is incumbent on

this Court to reverse the agency and give effect to Congress's clearly stated intent.

*See, e.g., Chevron*, 467 U.S. at 842.

**II.    The FCC's Strained Effort to Remove this Case from *Chevron –
Step One* by Attempting to Impart Ambiguity to the Unambiguous
Language of Section 331(a) Is Unavailing.**

Notwithstanding the clarity and directness of Section 331(a), the

Commission below sought to reinterpret that section in ways inconsistent not only

with the language, but also with the history and the purpose, of the statute.  There

is no legitimate basis for the FCC's imaginative reading of Section 331(a) and the

FCC's apparent effort to bootstrap itself out of *Chevron – Step One* is unavailing.

In the evaluation of a *Chevron – Step One* argument, the plain meaning of

the statutory language is "conclusive" "except in the 'rare cases [in which] the

literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Consolidated Rail Corporation v. U.S.*, 896 F.2d 574, 578 (D.C. Cir. 1989) (citing *U.S. v. Ron Pair Enterprises, Inc.*, 498 U.S. 235, 242 (1989)). Such "rare cases" must involve, "at a minimum, some clear indication of congressional intent, either in the legislative history or in the structure of the relevant statute, that informs the specific language in question." *Id.* This is *not* such a rare case.

### A.    The FCC's Interpretation of Section 331(a) Is Inconsistent with the Plain Language of the Statute.

According to the FCC, Section 331(a) applies only where the use of the channel in the unserved target state would be mutually exclusive with that channel's use in its current state. *MO&O*, ¶¶ 7, 13, 15). (JA 199, 202, 202-03)  In the FCC's view, a proposed channel reallocation must satisfy that dramatically limiting condition in order to constitute a "reallocation" within the meaning of Section 331(a). Since the reallocations described in the PMCM Notifications would not satisfy that condition, the Commission rejected them.

The FCC's imaginative interpretation is supposedly based on the agency's concern that Congress's otherwise plain language might, in some hypothetical circumstances at some indefinite point in the future, possibly have created a situation in which a reallocation pursuant to Section 331(a) might cause

interference to some existing station(s).  *Id.* at 13702. (JA 202)  Speculating that Congress could not possibly have intended such a result, the Commission conjured up an innovative re-definition of "reallocation" and invoked that narrowing definition to reject the PMCM Notifications.

As an initial matter, it is universally acknowledged that PMCM's proposed reallocations would not in any event cause any interference to existing stations entitled to protection.  Thus, the FCC's imagined scenarios are immaterial here.

Moreover, nothing in the statute supports the FCC's fanciful reading. Section 331(a), by its own terms, expressly applies to "*any* case" (emphasis added) – *not* just some artificially narrowed subset of cases.  The FCC's speculative reading of the statute is thus impermissible.  As this Court recently held,

> [w]hen a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then "it should take its concerns to Congress," for "[i]n the meantime it must obey [the statute] as written."

*Oceana, Inc. v. Locke*, Case No. 10-5299, slip op. at 10 (D.C. Cir. July 19, 2011) (quoting *Natural Resources Defense Council v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011)).

The Commission's implicit claim that it is able to mind-read Congress is particularly unpersuasive.  That claim is akin to a similar assertion made by another agency in *Jones v. Lujan*, 883 F.2d 1031 (D.C. Cir. 1989).  There, the

Secretary of the Interior sought to deny payment of legal fees in a certain class of

cases involving the Equal Access to Justice Act, even though that Act in no way

supported such denial.  The agency asserted that Congress could not have intended

for the statute to apply to the particular class of cases in question, much as the FCC

has attempted to dramatically narrow the scope of Section 331(a) here.

> The *Lujan* Court rejected the agency's argument, holding that
>
> the Government could cite no language in the statute or specific legislative
> history to support this proposition.  Instead, the Government advances the
> rather strange argument that, even though the terms of the statute support an
> award of fees in this case, fees should be denied because it cannot be shown
> that Congress envisioned the scenario [in question].  It would seem obvious
> that this court has no authority to speculate over hypothetical scenarios that
> Congress did and did not have in mind in enacting EAJA. Indeed, it is a
> fanciful notion to even think that we might be able to surmise what Congress
> "had in mind," apart from the specific words of the statute. We can only
> enforce the statute as written . . . .

*Jones v. Lujan*, 883 F.2d at 1034-5.  *See also Lewis v. City of Chicago*, 130 S.Ct.

2191, 2200 (2010).  ("It is not for us to rewrite the statute so that it covers only

what we think is necessary to achieve what Congress really intended.")

In view of the specific words of Section 331(a), the Commission's wholly

speculative basis for rejecting the PMCM Notifications was unsupported and

unsupportable, and that rejection was impermissible.

### B.    The FCC's Interpretation is Inconsistent with the Legislative History of Section 331(a).

Review of the legislative history underlying Section 331(a) confirms the plain meaning of the statute, *i.e.*, that Congress did not intend to drastically narrow the universe of stations eligible to take advantage of the second sentence of that section.  The *Conference Report* relating to Section 331(a)*,* H.R. Rep. No. 760, 781 (1982), *reprinted in* 1982 U.S.C.C.A.N., 1453 ("*Conference Report*") reflects that Congress envisioned the geographic embrace of the statute as being unrestricted, a view which this Court affirmed.  And, equally importantly, the *Conference Report* contains no indication that Congress intended that the second sentence of the statute be limited in any way:

- The *Conference Report* declared that the law applies to "*any* licensee in *another* state" which seeks to transfer its license to "an unserved state."  *Id.* (emphasis added).  It later re-emphasized the breadth of that universe, stating that "*any* current licensee" is entitled to avail itself of the second sentence of Section 331(a).  *Id.* (emphasis added).

- The *Multi-State* Court cited the *Conference Report* in support of the proposition that "[Section 331 was designed to] remove impediments which currently discourage a licensee *in a State* which has more than one VHF television station from voluntarily moving *to a State* which has none." *Multi-State*, 728 F.2d at 1525 (emphasis added).

–22–

- The *Multi-State* Court interpreted the "command" of Section 331 as follows: "[I]f *any* licensee volunteers to move to an unserved state, 'the Commission shall, notwithstanding any other provision of law, order such reallocation and issue a license . . . .'" *Multi-State*, 728 F. 2d at 1524 (emphasis added).

- The *Multi-State* Court quoted as a guiding light the words of then-Senator Bill Bradley, the sponsor of the bill that became Section 331(a):  "[The bill directs the Commission] to accept and grant the application of *any* current license holder who voluntarily requests to have its commercial VHF TV license moved to a State which does not have one."  *Id*. at 1523 (emphasis added).

All of these sources expressly, repeatedly and consistently treat the statute as applying to "any licensee" in "a" state, without limitation as to the location of that licensee's station.  There is no hint in the statute, the *Conference Report*, the *Multi-State* opinion, or anywhere else, that Section 331(a) was intended to apply *only* to licensees in states immediately proximate to the unserved states.  Had Congress intended to so severely circumscribe the application of the statute – and the states and licensees who could take advantage of it – Congress would have made that clear.  It did not. To the contrary, it used sweeping, non-exclusive, mandatory language punctuated by "notwithstanding any other provision of law".

–23–

The FCC's imagined reading of the statute finds no support at all in the legislative history; to the contrary, that reading is flatly inconsistent with Congress's expressed intent.

### C.     The FCC's Interpretation is Inconsistent with the Purpose and Structure of the Statute.

#### 1.     The purpose of the statute.

A foremost rule of statutory construction is that a statute should be read to effectuate its intended purpose. *Gordon v. Virumundo, Inc.,* 575 F. 3d 1040, 1049 (9th Cir. 2009). The Commission's strained interpretation of Section 331(a) defeats, rather than implements, the purpose underlying the statute. As this Court held in *Multi-State*, "the purpose of Section 331 is to provide each 'unserved' state with an operating commercial VHF station." *Multi-State,* 728 F. 2d at 1524. New Jersey and Delaware were expressly identified in the *Conference Report* as two such "unserved" states. *Conference Report* at 1453. Six months after the filing of the PMCM Notifications, the Commission itself acknowledged that New Jersey and Delaware were still without their own commercial VHF channels. *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Seaford, Delaware)*, Notice of Proposed Rulemaking, 24 FCC Rcd 14596 (Vid. Div. 2009); *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Atlantic City, New Jersey)*, Notice of Proposed Rulemaking, 24 FCC Rcd 14601

(Vid. Div. 2009).  Favorable action on the PMCM Notifications would have corrected that situation, as Congress intended.

In *Multi-State*, the Court was invited to construe the statutory term "allocated" in a way which would have prevented the provision of a commercial VHF station to New Jersey.  While the Court acknowledged that the suggested construction "ha[d] some appeal", the Court ultimately rejected that construction because it would "ignore congressional intent and thwart the legislative will." *Multi-State*, 728 F. 2d at 1522, 1524.

The statutory construction hypothesized by the Commission here must similarly be rejected because it, too, ignores congressional intent and thwarts the legislative will.

First and foremost, the FCC's construction would directly countermand the specific language of the statute, as discussed above.

Additionally, that construction would reduce the pool of licensees otherwise eligible to avail themselves of the second sentence of Station 331(a) by approximately 90%.  That sentence invites any commercial VHF licensee to fill an allocation gap created by the Commission's failure to comply with the first sentence of the section.  By maximizing the universe of eligible licensees, Congress increased the likelihood that its goal – local commercial VHF service in each state – would be realized.

–25–

The Commission's approach, by contrast, would narrow that universe drastically, making realization of the Congressional goal far *less* likely.  If, as the FCC claims, Section 331(a) were available only to licensees who happen to be locally proximate to the VHF-less state, the pool of potentially eligible reallocation volunteers would shrink from, essentially, all 350+ commercial VHF licensees nationwide to only the small handful of nearby VHF stations – possibly three dozen or so – that would fit the FCC's interpretation – a reduction of approximately 90%.  Such a reduction plainly flies in the face of the emphatically broad legislative intent evident on the face of Section 331(a).

Moreover, absent some extraordinary circumstance such as befell RKO – whose license was under prolonged and preliminarily successful attack – it is extremely unlikely that that (supposedly) constricted pool of eligible licensees would be motivated to relocate to the unserved states.  By contrast, stations in smaller, less economically-supportive, communities located at greater distances – such as PMCM's stations – would likely be far more motivated to relocate to New Jersey or Delaware.  As a result, the Commission's approach would *undermine* the legislative purpose by artificially and unnecessarily shrinking the pool of eligible licensees.

The Commission itself dramatically illustrates the extent to which it misconceives Congress's purpose. In its *MO&O*, the FCC forthrightly admits that

its interpretation of Section 331(a) is intended to "harmonize" Section 331(a) with other laws, including particularly 47 U.S.C. §307(b), the statutory provision that establishes the Commission's historical channel allocation framework. *MO&O* at 13705-06. (JA 204-05) Since Congress admonished that the second sentence of Section 331(a) is to be implemented "notwithstanding any other provision of law", it is clear that any attempt to "harmonize" Section 331(a) with other laws is contrary to Congress's direction.

The FCC's harmonization efforts are especially wrong-headed because, as the Court held in *Multi-State*, "Section 331 . . . displaced the normal procedures for channel reallocation as well as the normal procedures for issuing licenses. . . ." *Multi-State*, 728 F.2d at 1525. Yet the Commission refuses to let go of those procedures: "We do not think Congress intended for Section 331(a) to operate as a substitute for normal allocation procedures. . ." *MO&O* at 13708. (JA 207) That is precisely what Congress intended. Those were, after all, the "normal procedures" that had led to the allocation condition – including commercial VHF-less New Jersey and Delaware – that Section 331(a) was designed to correct. Recognizing that those procedures had failed to assure commercial VHF channels to all states, Congress drafted Section 331(a) to bulldoze over existing laws, regulations and policies, not to "harmonize" them.

Instead of bowing to Congress's judgment about how channels must be reallocated, the FCC is still trying to lasso Section 331(a) back within the ambit of the normal allotment procedures that Section 331(a) was intended to displace. That is like trying to "harmonize" a law with the statute that repeals it. The FCC still wants to be controlling a reallocation process that Congress has deliberately taken out of its hands. With classic bureaucratic intractability, the FCC has simply crawled into its familiar regulatory hole and refuses to come out, no matter what the law says.

### 2.    *The structure of the statute*

Finally, the Commission's approach to Section 331(a) ignores the structure of that provision. The first sentence of that paragraph establishes the overriding national policy (*i.e.*, every state is entitled to at least one commercial VHF station) and affords the Commission the opportunity to implement that policy as it sees fit. But if the Commission fails to do so, the second sentence removes responsibility for implementation of the policy from the Commission and effectively places it in the hands of any VHF licensee willing to avail itself of the opportunity presented by that sentence.

Resisting its relegation to a purely ministerial role, the Commission struggles to identify some rationale that would afford it some regulatory say-so here, based on rules or regulations or policies that the FCC deems important. But

Congress has given the agency no such discretion in the second sentence, as the Commission itself previously acknowledged in connection with the RKO proceeding. *RKO General, Inc.*, 1 FCC Rcd at 1083 (1986). When the second sentence is invoked, the reallocation is to be effectuated "notwithstanding any other provision of law."

The FCC's attempt to locate some exception to that all-encompassing statutory language rests on a single word. As the Commission seems to see it, Congress's use of the word "reallocation" in the second sentence of Section 331(a) was intended to alter, *sub silentio*, the term "notwithstanding any other provision of law" to read "notwithstanding some, but not all, other provisions of law."

It is, of course, illogical to assume that Congress would include absolutely unequivocal language – *e.g.*, "notwithstanding any other provision of law" – but then severely undercut the plain meaning of that language through implications supposedly inherent in a single unexceptional word. That is especially so here when the use of the word in question – reallocation – is easily understandable in the context of the statute.

The second sentence of Section 331(a) involves *not* a "new", previously unused allotment, or allocation, of a channel, but rather the relocation, from one community to another, of an existing station on a previously allotted, or allocated, channel. That process will thus not result in the initial "allocation" of the subject

–29–

channel, but rather the "reallocation" of that channel from its original community to a different community. The additional baggage that the Commission would load onto the word "reallocation" here is neither logical nor consistent with the rest of the statutory language. Nor, as discussed in greater detail below, had the Commission in or before 1982 (the year Section 331(a) was enacted) accorded the term "reallocation" any special meaning – much less the meaning it now claims – which Congress might be thought to have incorporated *sub silentio* into the statute.

As noted above, an agency attempting to act in contravention of the plain language of legislation faces an extraordinary burden: it must show some "clear indication of congressional intent" supporting the agency's position. *Consolidated Rail Corporation v. U.S.*, 896 F.2d 574, 578 (D.C. Cir. 1989). The Commission has failed to provide ***any*** such indication, much less a "clear" indication. To the contrary, Congress has spoken directly to the precise question at issue here, and that is the end of the matter: the FCC having failed to comply with Congress's clearly expressed will, it is incumbent on the court to do so. The decision below must be reversed. *See Chevron*, 467 U.S. at 842.

**III.  Even If the FCC's Decision Survives, *Arguendo*, *Chevron – Step One*, It Fails Under *Chevron – Step Two* Because It Is Not in Any Event Rationally Related to the Goals of Section 331(a) and Is Arbitrary and Capricious.**

While PMCM firmly believes, as set forth above, that the FCC's decision below cannot survive analysis under *Chevron – Step One*, we are also confident that it could not survive even the more relaxed *Chevron – Step Two* standard if such review were deemed, *arguendo*, warranted.  Under *Chevron – Step Two*, an agency's decision cannot stand if it is arbitrary, capricious or otherwise not rationally related to the goals of the underlying statute.  *See*, *e.g.*, *Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005); *Village of Barrington v. STB*, 636 F.3d 659, 363 (D.C. Cir. 2011).  The FCC's decision fails that test.

According to the *MO&O*, Section 331(a) can properly be read in the cramped fashion articulated by the FCC because: (a) the establishment of the DTV Table of Allotments left the Commission no opportunity to do otherwise; (b) the Commission's historical approach to channel reallocations (including its supposed historical use of the term "reallocation") supports the FCC's statutory interpretation; and (c) that interpretation will prevent the creation of interference that might otherwise occur under PMCM's interpretation. *MO&O* at 13706-7, 13705-6, 13705 (JA 206-07, 205-06, 205) Each of these rationales is wrong in multiple respects.  When the Commission's errors are demonstrated, it is clear that

the agency's reading of Section 331(a) is transparently inconsistent with both the statute's goals and the Commission's own precedent.

### A.    The DTV Transition Did Not Prevent the FCC From Allocating Commercial VHF Channels to Any State.

In the *MO&O*, the FCC misleadingly pretends that it could not allocate new channels to Delaware and New Jersey until the final effectiveness, on June 13, 2009, of the DTV Table: "After June 12, 2009… [i]t *then* became technically feasible to allot VHF channels to New Jersey and Delaware."  *MO&O* at 13699; *see also id.* at 13707 (JA 199, 207)  According to the Commission, prior to that time VHF allotments in compliance with Section 331(a) "w[ere] precluded during the DTV transition because of impermissible interference that would have resulted to existing analog stations."  *MO&O* at 13707, (JA 207)

Those assertions are patently and demonstrably untrue.

The mere inclusion of a channel in the DTV Table of Allotments would not cause interference unless a station were operating on that channel.  And the first sentence of Section 331(a) provides only that the Commission assure that a channel – not necessarily an operating station – is available in each state.  Once the transition was complete, however, a station operating on the channel allocated to the post-transition DTV Table would be able to operate without interference to or from any other station.

–32–

The DTV Table – in development since 1997 and set in its essentially final form since 2007 – included no Channel 2, 3, 4 or 5 allotments in any of the mid-Atlantic states. As the Commission itself conclusively established with its latterday allotment of Channels 4 and 5 to New Jersey and Delaware, those two channels could have been allotted there. *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Seaford, Delaware),* Report and Order, 24 FCC Rcd 4466 (Vid. Div. 2010), *pet'n for recon. pending*; *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments (Atlantic City, New Jersey)*, Report and Order, 24 FCC Rcd 2606 (Vid. Div. 2010). And as the PMCM Notifications demonstrated, Channels 2 and 3 could similarly have been allotted there. The only restriction on such allocations would have been that no stations could operate on any of those channels prior to June 13, 2009. The Commission included in the final DTV Table, in 2007, multiple channels on which operations could not be commenced until the ultimate DTV transition.[6]

Importantly, the feasibility of including VHF allotments for New Jersey or Delaware in 2009 was *not* dependent on any changes to the DTV Table occurring

---

[6] *Third Periodic Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, 23 FCC Rcd 2994, 3022 (2007) (acknowledging that operation on some allocated channels "cannot commence" prior to the conclusion of the DTV transition because "doing so would cause impermissible interference to other current television operations.")

after 2007.  In other words, if those VHF channels could be allotted to New Jersey and Delaware now, they could have been allotted there as of 2007.  So the Commission *could* have satisfied the first sentence of Section 331(a) by including in the DTV Table adopted in 2007 a vacant commercial VHF channel for each state.

The Commission failed to do so.  The Commission has provided no valid explanation for that failure.  Whatever the reason, the Commission can***not*** legitimately claim that it was in any way foreclosed from allotting commercial VHF channels as required by Section 331(a) prior to June 13, 2009.

The Commission's claim in that regard is doubly false in the case of New Jersey because it was the Commission itself which removed Channel 9 – the commercial VHF channel allotted in the RKO case in 1983 – from New Jersey during the DTV Table's development.  While the licensee of Station WWOR-TV initially elected Channel 9 as its DTV channel in connection with the decade-long transition process, the Commission disapproved that election in 2005.  *See* File No. BFRECT-20050210AWA. That disapproval effectively forced WWOR-TV to use Channel 38 as its final DTV channel, causing the deletion of Channel 9, New Jersey, from the DTV Table.  Had the Commission not disapproved WWOR-TV's initial DTV channel election, Section 331(a) would have been satisfied with respect to New Jersey well in advance of June, 2009.

–34–

Further confirming the falsity of the Commission's explanation is the fact that, to date, the FCC *still* has not allocated any commercial VHF stations to the Virgin Islands. *See* 47 C.F.R. §73.622(i). The DTV transition was completed almost three years ago, yet the Commission has done nothing to implement Section 331(a) vis-à-vis the Virgin Islands, just as it failed to do vis-à-vis New Jersey and Delaware until PMCM prodded it into grudging action.

**B.    The Commission's Decision Below Is Based on Incorrect Descriptions of Commission Precedent.**

In an effort to buttress its unsupported interpretation of Section 331(a), the Commission also mischaracterizes certain aspects of the historical reallocation process. *MO&O* at 13706.

1.    *The MO&O misstates Commission policy with respect to historical "impediments" to reallocation.*

Citing the *Conference Report*, the Commission alludes to certain "impediments" inherent in the FCC's reallocation processes that served to discourage licensees from voluntarily seeking to move their stations to states without commercial VHF allotments. *MO&O* at 13703. (JA 203) Section 331(a) was "meant to remove" those impediments. *Id.* In an effort to bolster its constricted view of Section 331(a)'s reach, the Commission asserts that those impediments would not have affected a licensee (such as PMCM) seeking to modify its station's license to specify operation in a distant state. *Id.*

–35–

The Commission is, again, woefully inaccurate.

The principal "impediment" to which the FCC (and the *Conference Report* [7]) refer is the fact that, by proposing to relocate its station to a different community, a licensee in 1982 (*i.e.*, when Section 331(a) was enacted) would subject itself to competing applications for the relocated authorization. *E.g.*, *Amendment of Section 73.606(b), Table of Assignments, Television Broadcast Stations (Riverside and Santa Ana, California)*, Report and Order, 65 FCC 2d 920 (1977) ("*Riverside*"). The threat of such competition created a substantial disincentive for such proposals.

But according to the Commission, licensees in PMCM's situation – *i.e.*, those seeking to relocate their stations to a "distant state" – would not have been subject to that threat. *MO&O* at 13703. (JA 203) Therefore, the FCC reasons, Section 331(a) was not intended to be available for such proponents; rather, Section 331(a) was to be available only if operation of the station with its relocated

---

[7] The FCC quotes Sen. Bradley's assertion on the Senate floor that Section 331 would remove impediments that discourage licensees in Philadelphia and New York from voluntarily seeking to move to New Jersey. *MO&O* at 13703. The Commission's quote misleadingly conflates the *Conference Report* (which evidences no limitation to New Jersey) with Senator Bradley's comments on the Senate floor. Although focused on the potential for reallocations to his own state, Bradley never suggested that reallocations to New Jersey were the *only* types of reallocations permitted by the law. In fact, he elsewhere noted that his amendment would permit *any* commercial VHF to move to *any* state without an allocation. *Conference Report* at 6186.

facilities would have been precluded by operation of the station with its original facilities.  *Id.*

The historical record does not support the FCC's claims.

As of 1982, Commission policies relative to reallocation of channels in the TV service (and the closely related FM service) provided that *any* proposed change in a station's community of license would be subject to competing applications. *E.g.*, *Riverside*, 65 FCC2d at 924.  Contrary to the *MO&O*, that risk was **not** limited to situations involving proposed moves to locations geographically proximate to – and, thus, from a technical perspective, mutually exclusive with – the proponent's already authorized facilities.  Rather, the risk applied to *all* change-of-community proposals.  *Id.*

In 1989, the Commission partially revised that policy.  *Modification of FM and TV Authorizations to Specify a New Community of License* ("*1989 Change-of Community Policy*"), Report and Order, 4 FCC Rcd 4870 (1989).  There the Commission determined that proposals to change a station's community-of-license would be immune from competing applications *as long as the proposal was mutually exclusive with the proponent's already authorized facilities.*  But the Commission's 1989 decision expressly stated that competing applications would still be permitted when the triggering proposal was *not* mutually exclusive with

that proponent's authorized facilities. *1989 Change-of Community Policy*, 4 FCC Rcd at 4873 and n. 15.

That last provision is important here because it establishes that, both before and after the 1989 policy change, (a) the Commission entertained change-of-community proposals that were *not* mutually exclusive with the proponent's authorized facilities, *and* (b) such proposals were subject to competing applications. Thus, contrary to the FCC's claim, the "impediment" of competing applications existed for change-of-community proposals regardless of such mutual exclusivity. [8]

Equally important here is the fact that the 1989 policy revision described above remains in effect. So the universe of potential Section 331(a) volunteers who would, under the FCC's reasoning below, be entitled to protection from "impediments" today – *i.e.*, proponents whose proposed, relocated facilities would be mutually exclusive with their authorized facilities – in fact no longer need protection: they have not been subject to the "impediment" of possible competing applicants for two decades. But the Commission would deny such protection to

---

[8] Contrary to the Commission's suggestion at ¶16 of the *MO&O*, this is not a case in which PMCM proposed the allocation of whole new channels unrelated to its already authorized channels. PMCM below proposed the reallocation of its channels to locations at which operations on those channels would not be mutually exclusive with PMCM's authorized operations – a circumstance contemplated in the *1989 Change-of-Community Policy*.

volunteers who were subject to such impediments in 1982 and who remain subject to them today – such as PMCM.

Because the Commission's justification is based on a plain misstatement of Commission precedent, it is arbitrary and capricious.

> 2. *The Commission Misstates Its Own Historical Use of the Term "Reallocation".*

As noted above, the Commission's decision below hinges to a substantial degree on the claim that the term "reallocation" as Congress used it in Section 331(a) has a peculiarly narrow meaning. *MO&O* at 13696. To the extent that the FCC's definition of that term (and the related "reallocate") is based on the notion that proposed changes in community-of-license were "reallocations" only if the proposal was mutually exclusive with the subject station's existing authorization, we have demonstrated above that that claim is fallacious.

But the Commission also asserts that the narrow definition of "reallocation" used below is "consistent with the Commission's past use of the term". *MO&O* at 13706. (JA 206) That, too, is inaccurate.

Not surprisingly, the term "reallocation" has been used to refer to any change to a previously-made "allocation". *See, e.g., SRC, Inc., San Angelo, TX*, Decision, 21 FCC 2d 901, 907 (1970) (previously deleted channel "reallocated" to community); *Amendment of Section 73.606(b) (Snyder, Texas)*, Notice of Proposed

Rulemaking, 6 FCC Rcd 5791, 5791 (Media Bureau 1991) (referring to "reallocation" of vacant TV channel from one community to another); *Amendment of Section 73.606(b) (Montrose and Scranton, Pennsylvania)*, Report and Order, 3 FCC Rcd 1061 (Media Bureau 1988) (same); *Advanced Television Systems and Their Impact on Existing Television Broadcast Service,* Memorandum Opinion and Order on Reconsideration, 23 FCC Rcd 4220, 4283 (2008) (channel previously allocated to one community "reallocated" to another).

It should also be noted that the term "allocate", closely related to "reallocate", was by the Commission's own acknowledgement used for years in a "colloquial, *i.e.*, erroneous" manner – both prior and subsequent to the enactment of Section 331(a). *Oversight of the Radio and TV Broadcast Rules*, Order, 1 FCC Rcd 849, 849 (Mass Media Bureau 1986). The Commission's admitted laxity with this language undermines the agency's assertion that the word "reallocate" has some precise and elaborate (albeit unstated) meaning.

Significantly, in the *1989 Change-of-Community Policy*, where the Commission addressed rules applicable to changes of community of license involving, *inter alia*, close-in moves, it never once referred to such changes as "reallocations". *1989 Change-of-Community Policy*, 4 FCC Rcd at 48870. This was carried through in 47 C.F.R. §1.420(i), the rule codifying that policy: the change in allocation triggered by the specification of a new, but close-by,

community of license is dubbed an "amended allotment". *Id.* at 4876. The term
which the FCC now claims was used *exclusively* to refer to changes of the type
undertaken by RKO in 1982 was not used *by the FCC itself* to refer to that kind of
change in the 1980s.

We have been unable to locate any uses, by the Commission, of the term
"reallocate" prior to the enactment of Section 331(a) which might have caused
Congress to believe that that term had the particular meaning that the FCC now
ascribes to it. The *MO&O* cites no such uses. Indeed, the Commission cites only
one authority in support of its assertion that its latest reading of "reallocation" is
"consistent with" its past use of that term: *Petition for Inquiry into the Need for
Adequate Television Service for the State of New Jersey,* 58 FCC2d 790, 802-04
(1976). *MO&O* at 13706. (JA 206) But nothing in that decision reflects the
limiting definition of "reallocation" the Commission now embraces.

That the Commission may, in 2011, have finally settled on a hard-and-fast
definition of "reallocate" to inform future readers of the intended meaning of that
term is immaterial to the instant case. The Commission cannot legitimately claim
that that new-found meaning enjoys any precedential antecedents. And most
certainly there is no reason to believe that, in using "reallocation" in
Section 331(a), Congress understood that term to mean anything but the relocation

of a previously allocated, or assigned, channel from its original community to a

different community.

### C.    The FCC's Interpretation of Section 331(a) Would Afford Neither the Protections nor the Service Claimed by the Commission.

There remains still one more aspect of the Commission's decision below that

establishes that it is plainly arbitrary and capricious: the Commission's strained

interpretation of Section 331(a) would not produce the results that the FCC claims,

since it would still leave open the potential for destructive interference from

reallocated channels while failing to assure the availability of local commercial

VHF to each state.

First, the Commission claims that its narrow interpretation of Section 331(a)

would eliminate any risk that a Section 331(a) reallocation would create

interference and thus be not "technically feasible".[9]  That claim is untrue.

As the DTV Table demonstrates, commercial VHF Channel 11 is now

allotted to Baltimore, MD, New York, NY and Wilkes-Barre, PA.  Under the

Commission's interpretation of Section 331(a), Channel 11 in New York could

have elected to relocate its technical facilities and city of license to Trenton, New

---

[9] PMCM is constrained to observe again that the FCC's concern about hypothetical interference here is bizarre because the PMCM Notifications present no risk at all of any interference, nor has the Commission ever suggested that they might.

Jersey.   At the same time, Channel 11 in Baltimore could have elected to relocate *its* technical facilities and city of license to Dover, Delaware.  Both relocations would have been permissible in the Commission's view because they would have been mutually exclusive with operation at their original location.[10]

Yet those relocated Channel 11 stations would presumptively cause interference to each other *and* to the existing Channel 11 Wilkes-Barre, PA station because they would all fail to meet the minimum separation requirements.[11]  So the FCC is wrong when it claims that its interpretation of the statute would perforce avoid interference.

Second, the Commission's idiosyncratic interpretation would inexplicably *preclude* a number of states from eligibility for relief.  The Commission asserts that Section 331(a) relief is available only to states that happen to be immediately adjacent to states with VHF stations.  This means that non-contiguous states – Alaska and Hawaii – and most of the U.S. territories would be out of luck if they found themselves without a commercial VHF allocation because there could never

---

[10] *See* 47 C.F.R. §73.623(d), which sets out the post- transition DTV station separation criteria.

[11]  *See* 47 C.F.R. §73.610(b), which requires co-channel stations to be at least 169.5 miles apart.

be an FCC-licensed station immediately adjacent to them to provide the relief envisioned by Congress.

This is by no means a frivolous point: under the post-transition DTV Table, the U.S. Virgin Islands *currently have no commercial VHF allotment*.  Under the FCC's flawed reading of Section 331(a), there are only five commercial VHF allotments, all in Puerto Rico, that could possibly relocate to the Virgin Islands while maintaining mutual exclusivity with their current location.  That reading would disqualify from eligibility the more than 350 other commercial VHF stations licensed by the FCC.  The FCC has thus not only ignored the mandate of the first sentence of Section 331, but would severely impede – by reducing the number of eligible volunteers by a factor of some 98% – the Virgin Islands' ability to get the relief that the second sentence of Section 331(a) expressly guarantees.

The foregoing demonstrates that the FCC's interpretation of the statute doesn't make sense even on its own terms.  It bars remedial reallocations – like PMCM's – which create no interference to anyone, it bars reallocations to Hawaii and Alaska and various territories, and it prevents the stations with the strongest incentive to relocate – *i.e.*, stations (such as PMCM's) located in smaller communities at considerable distance from larger communities – from doing so.  On the other hand, it *allows* relocations like those in the Channel 11 hypothetical above by stations that would presumptively cause interference and that would thus

have no apparent incentive to move in the first place.  In *Chevron II* parlance, the

Commission's interpretation is not "rationally related to the goals of the statute,"

*AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 388 (1999), because it

effectively prevents or impedes the statute from ever being implemented.

Moreover, the FCC's rationale is based on materially inaccurate assertions of

precedent, fails to further goals of the statute, and even fails on its own terms.  The

decision below is thus arbitrary and capricious.

## IV.     Conclusion and Request for Relief

For nearly 30 years the Commission has been subject to an unequivocal

directive from Congress: assure the provision of at least one commercial VHF

television channel to each state.  As of June 15, 2009, the Commission had failed

to comply with that directive, despite the fact that the intervening DTV transition

had afforded it the opportunity to do so.  How that failure occurred has not been

credibly explained.

Contemplating – possibly even expecting – that the FCC might fail to

comply with its statutory duties, Congress included in Section 331(a) a back-up

mechanism.  The second sentence of Section 331(a) gives any licensee of a

commercial VHF station the power to effectuate Congress's goal through a simple

notification, should the FCC have failed in its responsibilities as of the time of the

notification.  Upon receipt of such notification, the FCC is required, notwithstanding any other provision of law, to reallocate the channel(s) specified in the notification and issue license(s) accordingly.

PMCM filed two such notifications.  The Commission should have greeted those notifications with open arms, since favorable action on them would have brought the FCC's DTV Table into compliance with Congress's clearly expressed goal.

Instead, the Commission rejected PMCM's Notifications.  In doing so, it relied on claims about its own processes and precedents that were so demonstrably inaccurate as to suggest that those claims may not have been made in good faith. Could it be that the Commission, embarrassed that its failure to comply with Section 331(a) was brought to light by PMCM's Notifications, determined that the reallocations mandated by that section should nonetheless be withheld from PMCM?  In the absence of any credible alternative explanation, the record below does not discourage such concern.

This case obliges the Court to remind an administrative agency that the agency is a creature of Congress and that the agency's mandate is to implement the law, ***not*** to rewrite, evade, or weasel out of the law.  Congress adopted in Section 331(a) a swift, forceful and mandatory reallocation mechanism that deliberately overrides the FCC's usual channel allocation processes; that process

brooks no "interpretive" evasions that would effectively read the provision out of the Act. The Commission's interpretation purports to address an ambiguity that does not exist, and does so in a way that is both ineffective and exactly counterproductive to the universally acknowledged intention of Congress.

PMCM prays that the Court promptly reverse the Commission's *MO&O* and direct the Commission to effectuate the reallocations referenced in PMCM's notifications forthwith. Further, given the FCC's demonstrated institutional

resistance to implementing Section 331(a), PMCM prays that this Court retain

jurisdiction of this matter to ensure that the mandate is effectuated without further

administrative roadblocks.

Respectfully submitted,


/s/      Donald J. Evans
Donald J. Evans
Harry F. Cole
Anne Goodwin Crump
Christine E. Goepp

Fletcher, Heald & Hildreth, PLC
1300 North 17th Street – 11th Floor
Arlington, VA 22209
703-812-0400

*Counsel for PMCM TV, LLC*

January 3, 2012

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because it contains 10,508 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the
typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements
of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced
typeface using Microsoft Word 2007 in 14-point Times New Roman.


/s/    Donald J. Evans
       Donald J. Evans
       Counsel for PMCM TV, LLC

January 3, 2012

**CERTIFICATE OF SERVICE**

I, Donald J. Evans, hereby certify that on January 3, 2012, I electronically

filed the foregoing Final Brief of Appellant PMCM TV, LLC with the Clerk of the

Court for the United States Court of Appeals for the D.C. Circuit by using the

CM/ECF system.  Participants in the case who are registered CM/ECF users will

be served by the CM/ECF system:


Laurence N. Bourne, Esquire
C. Grey Pash, Jr., Esq.
Richard Kiser Welch, Esq.
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554



/s/     Donald J. Evans
            Donald J. Evans